GALVESTON, H. & S. A. RY. CO. v. CHOJNACKY.    (No. 5514.)*

(Court of Civil Appeals of Texas.    San Antonio.    Nov. 3, 1915.    On Motion for Rehearing, Dec. 1, 1915.)

1. MASTER AND SERVANT ⬥278—INJURIES TO SERVANT — NEGLIGENCE — SUFFICIENCY OF EVIDENCE.

In an action by a railroad employé for injuries received when a flame, charged to have been caused by an exploding railroad torpedo, darted out from the furnace in which he was burning rubbish, injuring his eyes, evidence *held* insufficient to sustain verdict for plaintiff by showing failure of defendant to perform its duty to him, proximately resulting in the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⬥278.]

2. MASTER AND SERVANT ⬥265 — INJURIES TO SERVANT—RES IPSA LOQUITUR.

Where a railroad station employé was injured when burning rubbish in the station furnace by the alleged explosion of a torpedo, causing flame to dart from the door, injuring his eyes, the case was not proper for the application of the maxim res ipsa loquitur to establish his case, since, if the maxim proved that there was a torpedo in the furnace, plaintiff was still under necessity to show that the railroad's negligence caused it to be there.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. ⬥265.]

Appeal from District Court, Bexar County; S. G. Tayloe, Judge.

Action by John Chojnacky against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Baker, Botts, Parker & Garwood, of Houston, and Templeton, Brooks, Napier & Ogden and Ed W. Smith, all of San Antonio, for appellant. Don A. Bliss and T. T. VanderHoeven, both of San Antonio, for appellee.

CARL, J. This is the second time this case has been before this court. The former opinion will be found in 163 S. W. 1011.

[1] Appellee, John Chojnacky, sued the Galveston, Harrisburg & San Antonio Railway Company for damages on account of injuries received by him while burning trash, paper, etc., in a stove in the basement of the depot of appellant, in San Antonio, during September, 1912. Appellee was an assistant gardener, working under Harry Adams, and his duties were to assist in the garden work on the grounds, look after the flowers, and to keep the park, or garden, clean of papers, peanut hulls, banana peels, etc. At the time of the accident he was putting an armful of papers in the stove, when a flame came out at the door and struck him in the face, injuring his eyes.

In substance, the cause of action was predicated upon two alleged acts of negligence, viz.: (1) That fusees or signals used by trainmen had been negligently scattered or left in the refuse on the premises, and that they were dangerous, and probably caused an alleged explosion in the stove, which threw the flame out into appellee's face as he was putting the papers in the stove. This ground, however, was eliminated by the trial court by failing to submit it to the jury, and no objection was preserved thereto by appellee. (2) That the defendant's employés, agents, and servants had negligently scattered and left railroad torpedoes in the refuse swept by its porters from defendant's closets, baggage rooms, and offices into the basement of the depot, and which was burned by appellee in the stove, or furnace. In other words, that the master had not used ordinary care to furnish the servant a reasonably safe place in which to perform his duties. It is alleged that these torpedoes and other compositions were explosive and dangerous when subjected to heat, and would explode "with violence, force, and flame," and that this was known to the defendant, or should have been known. And, further, that the defendant knew, or should have known, that such dangerous explosives and combustibles were being negligently scattered and left in the refuse, and if ordinary care had been exercised in this respect, the plaintiff would not have been injured. Any further statement of the case which may be necessary will appear in the discussion which follows.

The first assignment of error attacks the verdict and judgment as being unsupported by the pleadings, the evidence, and the court's charge to the jury, the particulars of that assignment being as follows:

"The plaintiff based his cause of action upon, and the court's charge authorized a verdict for plaintiff only in the event of an affirmative finding of, the following facts: (a) That defendant's employés scattered and left railroad torpedoes in the refuse swept by its porters and sweepers from defendant's closets, baggage

rooms, and offices, and burned by plaintiff in defendant's furnace; (b) that such torpedoes were explosive and dangerous; (c) that in so scattering and leaving such torpedoes ·in such refuse the defendant failed to exercise ordinary and reasonable care for the safety of plaintiff in the discharge of his duties; (d) that while plaintiff was burning such refuse in said furnace there was an explosion of torpedoes, which had been so scattered and left in such refuse and placed in said furnace; and, (e) that such explosion of such torpedoes directly caused the alleged injury to plaintiff's eyes. Upon the trial of the case there was no testimony showing, or from which the jury could legally infer, all or any of such facts, while the uncontroverted testimony of all witnesses testifying upon this issue showed that neither of such facts, as alleged and submitted in the court's charge, existed."

This makes it necessary for us to state in detail the substance of the evidence, in its most favorable light, in behalf of appellee.

Appellee, Chojnacky, testified that he was an assistant gardener; that Harry Adams was his superior; that before the accident occurred he had found there in the trash some kind of candle sticks. He says that about three months after that he found some torpedoes in there, and threw them in the trash can outside of the building, and that when he found this second batch he told Harry Adams about it. This was several months before the accident happened. On the morning of the accident he saw no torpedoes, and says that he does not know what it was that made the noise in the furnace when he was injured. "I saw nothing in the stuff I was burning to make such a noise as that." The noise which he testified he heard was a kind of "chooh," or "tschoog." During all the time that he had been working there at the station and burning stuff in the furnace he says that he had discovered some of these things three times. The first time, something he speaks of as candle sticks, or something like that, and twice that he says he found torpedoes in the trash that was burning in the furnace. One time, he says, he found three, and then again some more, but he does not remember how many. Those three times are the only times that he ever found anything of this kind. In the first lot he says he found three torpedoes, and several months after, he found the second lot. He does not remember how long before the accident it was that he found the last lot, but says it was several months before, some three or four months, may be more, or less. He says that he was shoveling up the trash and putting it in the stove, where he had an "awfully hot fire"; that the furnace was nearly full, there being only a small place at the right-hand side of the door which was not filled with the burning papers, etc. But, he says that Harry Adams, his foreman came in and saw him using the shovel, and told him that was· not the way to do, to use his hands, to which he demurred. Adams, however, he says, jerked the shovel out of his hands, threw it in the corner of the room, and grabbed up some of the trash to show him · how to do it, and told him to do it that way, using some language towards him not suitable here to repeat. Adams then went away, and a plumber, who had come in to cut off the water in order to do some plumbing up stairs, was the only person in the room at the time of the accident, other than the plaintiff below. Chojnacky says that when he put this armful of trash in the stove he had his face very close to the door. At first, he says within six inches, and then again he says within about a foot, and while so placing the stuff in the stove he heard the noise above described, and the flames shot out, striking him in the face and injuring his eyes. He says that the noise he heard was not loud, about like a man talking, and not so loud as a firecracker, but that it could be heard 12 or 15 feet away. He does not undertake to say what it was that made the noise, nor does he know that it was a torpedo.

Fritz Dethlefsen, the plumber who was cutting off the water at the time of the injury, says that he was standing on a box where he had to reach up to cut off the water near the ceiling, when it occurred, and was somewhere about 8 or 10 feet from Chojnacky.

"I had finished my work and just turned around, and just as I turned around I seen him fall—time I seen the flame hit him and he fell back; just as I turned around to step off of the box, I saw a small flame come out of the door of the furnace into his face, yes, and he just fell back, and held his hands over his eyes. When I turned around and saw him when this happened, he was just kneeling down, sorter, leaning over; he had just grabbed a handful of paper and just put the paper into the furnace, was putting the paper into the furnace when I saw a flame come out at the time into his face; no, his face wasn't very close to that door; it was about a foot away from the door. * * * There was nothing came out of that door, except just simply that flame, that I saw. Yes, there· was a big fire burning in the furnace. * * * I heard no noise; yes, my hearing is normal, all right; I was about 8 feet from him. * * * There was no one else there. * * * I don't know whether that was a flame from the paper, a torpedo, or what; no, sir."

This witness, being the only one there, took Chojnacky over to the drug store. The only other person who attempted to say that he ever saw any torpedoes around there is one R. W. Taylor, who runs a moving wagon, and claims to have found a torpedo at some time, he knows not when, right in front of where the closet is; where you come out of the closet. He would not even hazard a guess as to how long prior to the accident this occurred. This was out south of the baggage room, just before you get to the express office, and is a considerable distance from where the accident occurred.

The witness, George King, testified that when torpedoes are thrown into the fire they explode with a puffing noise, not as loud, the witness thought, as a man would talk. He said that he had seen a number of torpedoes

thrown into the fire and knew the effect thereof.

J. L. Price, a switchman for a number of years on the railroad, testified that when a torpedo is thrown into the fire it explodes with a noise about like a firecracker, probably a little louder. He had tried the experiment himself.

The employés of the railroad company testified that the torpedoes used by the company—and they use a great many—were kept under lock and key, some 200 or 300 feet from where the accident occurred, in what is referred to as a "shack."

Appellee says that on one occasion he found some torpedoes, and Harry Adams told him to throw them in the fire and burn them up, but he refused to do this, giving as his reason that they were dangerous, and says that he took them and put them away.

"Before Harry Adams told me what they were, I didn't know. I told him to go up stairs and tell them people to be careful and not throw them around, because they are dangerous. He says its none of his business, he says, 'I can't help you in that,' he says, 'the big boss says to burn them.'"

There is evidence in the record to show that a stove, when stopped up, or when the draft is cut off, will cause the flames to shoot out at the door when opened, especially when there is a hot fire in the stove such as was in this furnace upon this occasion.

As to his injuries, appellee testified that his eyes were so that he could not see out of them for a good long while; that they pained him a great deal; that he had been under the treatment of a doctor for a good long while, at an expense of about $100; and that even now he cannot see well, a man appearing to him something like a bear.

Dr. Gwinn, an eye specialist, testified that he was under his treatment about six weeks, and he discharged him as cured, and says that his eyes at that time appeared to be normal.

Appellee contends upon this trial that he never put papers in the coal bin, but that other employés did, and there is where he was getting the papers which he was placing in the fire at the time of the accident. On the former trial he had testified that the coal bin had been filled with coal, but this time he says that was a mistake; that the interpreter did not properly interpret to him his deposition as given upon the former trial, and likewise one of his attorneys explains in his testimony that he did not understand the oral statements of appellee at the time of the other trial, or until he drew up the second amended petition, upon which this case was tried.

So, when analyzed, appellee's case is this: He is injured by a flame from the furnace striking him in the face, without anything except surmise upon which to base the conclusion that a torpedo was in the trash put in the furnace. As proof that there was a torpedo in the trash, he says that some months prior thereto he had found some of them, and knew they were dangerous when thrown in the fire. So much so, indeed, that he refused to follow his foreman Harry Adams' order, to throw them in the fire. He heard some kind of "chooh" noise at the time the flame licked out and struck him in the face. There is no testimony that any servant or employé of the railway company put any torpedoes in the trash at any time. Those found by him could just as easily have been put there by any one else. This is especially true when we consider that every employé of the company who testified denied ever having thrown any torpedoes in the trash, or that they had ever seen any lying around there. On the contrary, they testified that the company kept them under lock and key, about 200 feet away from the place of the accident.

But if we give full credence to the statement of appellee that he found torpedoes there and told Harry Adams about it, he likewise says that he knew they were dangerous, and so refused to obey orders by throwing them into the fire. He was in a better position to know what was in the trash than any one else, for it was his business to gather it up and burn it or put it in the place provided. If he did know that such things were in the trash; that he was expected to burn them, and did not quit, but went ahead at the same work after, as he says, Adams told him it was the order of the "big boss" that he burn them, it looks very much like he assumed the risk.

Facts may be established by circumstantial evidence, it is true, but where such testimony is relied upon it should be much more cogent than that contained in this record. We fully agree with the Supreme Court, speaking through Judge Brown, when it said:

"However, it is well settled by authority that the circumstances attending the injury may be sufficient to establish the fact of negligence without any direct proof thereof." McCray v. G., H. & S. A. Ry. Co., 89 Tex. 168, 34 S. W. 95.

Also T. & N. O. Ry. Co. v. Crowder, '63 Tex. 504. In the case first cited, McCray was sitting on one of several cars loaded with steel rails. The train was going about 25 miles per hour, when one of the rails fell from the flat car in front of the car upon which McCray was riding. One end of the rail struck the ground, and the other end was resting on the side of the car, and as a witness said, "swept the whole north side of the train," striking McCray and killing him. Upon reaching San Antonio the standards were all in place and were in good condition, etc. It will easily be seen that the case at bar is quite different. Here we must establish by circumstantial evidence, weak within itself: First, that there was a torpedo in the furnace that caused the injury; and, second, that it was negligently left in the trash, or permitted to be there, by some employé who had failed to perform a duty. It is just as reasonable to suppose that the

flame was caused to shoot out by the draft having been cut off or stopped up. We think it is a matter of common knowledge that stoves do those things. But be that as it may, the duty rests upon the plaintiff to establish his case by competent testimony. He must plead and prove that the company owed him a duty; that it failed to perform that duty; and that such failure to perform that duty was the proximate cause of his injury. This we think he has wholly failed to do. Railway Co. v. Jones, 103 Tex. 187, 125 S. W. 309; Railway Co. v. Cason, 129 S. W. 394; Railway Co. v. Chojnacky, 163 S. W. 1011.

[2] But appellee invokes the doctrine symbolized by the maxim, res ipsa loquitur, which we understand means that the thing speaks for itself, or is a short way of saying that the circumstances attendant upon an accident are, of themselves, of such a character as to justify a jury in inferring negligence as the cause of that accident.

"The doctrine which it embodies, though correct in itself, may be said to be applicable to two classes of cases, to wit: 'First, when the relation of carrier and passenger exists, and the accident arises from some abnormal condition in the department of actual transportation; second, where the injury arises from some condition, or event, that is in its very nature so obviously destructive of person or property, and is so tortious in its quality, as in the first instance, at least, to permit no inference save that of negligence on the part of the person in control of the injurious agency.' "

For instance, where a section hand stepped back 5 or 6 feet, with others, to permit a train to pass, a big lump of coal fell off and hit him on the neck, from which his injuries resulted. There was nothing to show what caused the coal to fall off. Justice Neill, speaking for this court (G., C. & S. F. Ry. Co. v. Wood, 63 S. W. 165) said:

"There must be reasonable evidence of negligence. But when the thing is shown to be under the management of the defendant or its servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of an explanation by defendant, that the accident arose from want of care" (citing McCray v. Railway, supra).

But there the employé had the lump of coal falling with which to start. If it were proved that there was a torpedo in the furnace, it would still be necessary to show that the negligence of the defendant's employés caused it to be there.

It occurs to us that the evidence is totally insufficient to support the judgment. This case has been tried twice and appears to have been fully developed, and it would be idle to send it back again for trial. Therefore the judgment of the trial court is reversed and judgment is here rendered that the plaintiff below take nothing by reason of this suit, and that he pay the costs.

Reversed and rendered.

### On Motion for Rehearing.

Appellee insists that we have not found sufficient facts, and have found some incorrectly. We used the term "stove" in some places when referring to the place where the papers were being burned, but we should have said "furnace." The word "fusee" was not used in plaintiff's petition, but the things he charges were left in the refuse which he was burning were:

"What are called torpedoes and other compositions, the names and exact nature of which are unknown to plaintiff, but all of which are explosive and dangerous," etc.

The witness, Dethlefsen, said the cut-off upon which he was working at the time of the injury was about 12 feet from the front door of the furnace, and that the cut-off was about 1 foot from the ceiling, and he had gotten upon a box in order to get to it. So he (Dethlefsen) was anywhere from 8 to 12 feet from the front of the furnace at the time of the injury.

Several witnesses testified, in substance, that they had kept a lookout for torpedoes when sweeping, but said they had not been instructed to look for them. Charles Stevens denied that he had ever found any torpedoes, but in answer to a question formed as follows: "Q. You always looked to see if there was any torpedoes?" he said: "A. Yes, sir: always picked them up; always have to see anything like that. I always picked it up; always looked closely to see whether there was any there."

This court is not unmindful of the seriousness of a reversal and rendition of judgment, neither is it unmindful of the serious and far-reaching effect of a court decision which would transfer a large sum of money from the railway company upon a mere surmise of wrong on its part. Appellee has had his case ably presented, and after two trials and two appeals it is not reasonable to presume that there are any matters of consequence which could be presented that have not already been developed. And with all this there is no sufficient showing that the injury of appellee was caused by the wrong or negligence of appellant. Since this is our view, the motion for rehearing is overruled.